Steven Bailey SBN 146382
Bailey and Romero Law
680 Placerville Drive Suite A1
Placerville, CA 96667
Phone: (530) 647-3554
Email: steven@baileyandromero.net
Attorney for Ronald Mele

# UNITED STATES COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES,**

   Plaintiff,

vs

**RONALD MELE,**

   Defendant

Case No.: 21-cr-392-6 (RCL)

**SENTENCING MEMORANDUM**

## INTRODUCTION

Ronald Mele ("Defendant"), by and through counsel, hereby submits the following sentencing memorandum.

The court had set April 19, 2024, as the date for sentencing after a jury trial that ended with the defendant being convicted by a unanimous jury of the following charges:

1. Count 1:  Conspiracy to obstruct official proceeding.
      18 USC § 1512(k)

2. Count 2:  Obstruction of an official proceeding and aiding and abetting.
      18 USC § 1512 (c)(2) and 2

3. Count 3:  Entering and remaining in a restricted building or grounds with a deadly or dangerous weapon.
      18 USC §1752(a)(1)

//

//

4. Count 4:   Disorderly and disruptive conduct in a restricted building or grounds.
with a deadly or dangerous weapon.
18 USC §1752(a)(2)

## I.
## DEFENDANT RONALD MELE DID NOT PROSSESS FIREARMS OR OTHER DANGEROUS WEAPONS ON THE CAPITOL GROUNDS ON JANUARY 6TH.

Ronald Mele did not possess firearms or other dangerous weapons at the Capitol grounds on January 6th. Contrary to what is stated in the pre-sentence report, the evidence showed at trial that defendant did not have a knife attached to the plate protector vest that he was photographed wearing at the Capitol.

Additionally, the defendant testified that he had removed the plate from the front of the plate protector and only had a plate in the rear of the vest because he was concerning about someone assaulting him from behind and had no fear that he would be assaulted from the front.

When the shield protector was photograph over a month later at the defendants' home in California it had been reconfigured for its storage in the closet.

The defendant fully admits that he did possess bear spray which was attached to his vest on January 6th. He was photographed with the spray attached to the pocket of the vest. However, it should be noted that he never removed the canister from the pocket and never discharged the spray. We know that he never used the spray because the safety was still attached when he was photographed leave the restricted area.

### A. DEFENDANT RONALD MELE DID NOT COLLECT WEAPONS TO TAKE TO THE CAPITOL.

The defendant testified that he brought a weapon to Washington DC and locked those weapons in the hotel safe. With the exception of a shotgun which was locked in the vehicle that they drove no weapons were taken on the streets of Washington DC. The defendant testified that he was aware that his concealed weapons permit from California would not provide

2
DEFENDANT RONALD MELE SENTENCING MEMORANDUM

authorization for him or those with him to possess firearms in a concealed manner and that he did not conceal those weapons on his person during his stay in Washington DC.

In addition, simply traveling with gear to Washington DC regardless of the reason does not trigger the application of this section. Planning the trip, driving cross country with gear including some firearms that were never taken to out to the streets of Washington DC does not constitute what is contemplated by this section.

It is not appropriate therefore to impose a 2-level addition pursuant to USSG §2J1.2(b)(3).

USSG §2J1.2(b)(3) reads as follows:

(3) If the offense (A) Involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by two levels.

Nothing that the defendants did in this case was so extensive in scope, planning, or preparation as to warrant a 2-level increase.

The rest of the section involves the destruction of documents and evidence that could have been used in a proceeding. The defendants in this case simply agreed to travel to Washington, DC and except for bringing firearms for protection on the trip, nothing out of the ordinary justifies a 2-level increase.[1]

---

[1] **Inapplicability of § 3C1.1**--For offenses covered under this section, § 3C1.1 (Obstructing or Impeding the Administration of Justice) does not apply, unless the defendant obstructed the investigation, prosecution, or sentencing of the obstruction of justice count.
U.S.S.G. 2J1.2

A. TYPES OF FACTS THAT THE LEVEL INCREASE HAS BEEN APPLIED:

Two-level enhancement to defendant's sentence, for offenses involving falsification of data in medical record of 76-year-old patient recovering from heart surgery at Department of Veterans Affairs (VA) hospital and obstructing VA's investigation of patient's death, was warranted on ground that defendant, a nurse at the hospital, altered essential or especially probative records; VA had regulation requiring that, when a patient died, there would be an investigation into quality of that patient's care, and so the patient's medical chart from the day of his death would have been a key piece of evidence in investigation of both patient's death and the obstruction charge against defendant.  United States v. Mathews, C.A.11 (Fla.) 2017, 874 F.3d 698.

Imposition of two-level sentencing guidelines enhancement for an offense extensive in scope, planning, or preparation was proper, in sentencing defendant who pled guilty to obstructing an official proceeding, based on defendant's conduct towards an attorney that defended a corporation in three pro se lawsuits brought by defendant, which included taking photographs of the attorney's house, finding photographs of the attorney's children online, doctoring those photographs to add rifle cross-hairs, writing a menacing e-mail to the attorney including those photographs, and displaying a loaded rifle to attorney's law partner; defendant engaged in extensive planning to obtain the photographs of the attorney's house and family members, create a false e-mail account to send the menacing e-mail, and otherwise plan and disguise his actions.  U.S. v. Bakhtiari, C.A.8 (Mo.) 2013, 714 F.3d 1057, post-conviction relief denied 2014 WL 988450, habeas corpus dismissed 2018 WL 833157, affirmed 738 Fed.Appx. 739, 2018 WL 3099899.

Obviously the facts in this case do not show the destruction of any documents or tangible objects and as stated previously, there is nothing that shows scope, planning or preparation of such a sophisticated level as to trigger the level increase. Renting a car board reserving a hotel room takes no sophisticated planning and putting your luggage together for a trip is hardly sophisticated preparation.

---

The Court should consider whether USSG §2J1.2 or §3C1.1 can both apply in this instance.

4
DEFENDANT RONALD MELE SENTENCING MEMORANDUM

The defendant therefore urges the court to strike the two level increase pursuant to USSG §2J1.2(b)(3).

## II.
## WHILE PRESENT WITH THE MOB ON JANUARY 6TH, DEFENDANT RONALD MELE WAS A MINOR PARTICIPANT IN THE RIOT.

While the defendant admitted that he was present in the mob and did nothing to prevent the movement of the mob, nor did he do anything to protect the law enforcement officers that were being assaulted by the mob, he always believed himself to be a rather minor participant in the events of January 6th.

This belief is predicated on the fact that the defendant did not participate in any violent acts against law enforcement or for that matter any other person present on January 6th. He didn't push directly against police lines, throw chairs or other objects use pepper spray or any other toxic material. In fact other than photographing what was occurring including photographing the individual who pepper sprayed the officer on the west lawn, he did not engage with law enforcement.

The defendant never entered the capital building itself and was on the West terrace for approximately 10 minutes before seeing the melee on the West terrace he left and made his way off the terrace down the steps and back to the lawn where he remained outside of the mob action and eventually left the premises altogether and returned to his hotel room before the citywide curfew was imposed at 6:00 PM on the evening of January 6th.

While one can disagree with the defendants belief that he was a minor participant in the crowd, this belief is his personal belief and must be considered as such. That fact does not negate the fact that he has taken responsibility for his actions on that date. He testified truthfully at trial

concerning his remorse for his actions. His remorse is reflected in the statement that is attached to the pre-sentence report on page 14 at paragraph 80.

### III.
### DEFENDANT RONALD MELE TESTIFIED TRUTHFULLY AT TRIAL.

Defendant testified that he never saw the prior Telegraph messages. He joined the DC brigade telegram chat approximately two hours after the original messages were posted and there was no actual evidence that the defendant saw the prior messages. In fact, his testimony was that he never saw the posts and therefore was truthful when he testified at trial. The Government offer no evidence to the contrary, other than their spin on the evidence, to contradict the testimony.

#### A.  IMPOSITION OF A 2-LEVEL ADJUSTMENT PURSUANT TO USSG §3C1.1 IS NOT JUSTIFIED.

United States sentencing guidelines §3C1.1 reads as follows:

§3C1.1  Obstructing or Impeding the Administration of Justice

If (1) The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) The obstructive conduct related to (A) The defendants offense of conviction and any relevant conduct; or (B) a closely related offence, increase the offense level by 2 levels.

The commentary on the guidelines provides relevant direction. In #2 of the commentary for §3C1.1 the following clarifications are provided:

2.   Limitations on Applicability of Adjustment. —*This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt* or provide information to a probation officer, or refusal to enter a plea of guilty *is not a basis for application of this provision.* In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may

result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

The Guidelines provide a non-exhaustive list of conduct that is covered by §3C1.1.

**Examples of Covered Conduct.**--The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies:
   (A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
   (B) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;
   (C) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;
   (D) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;
   (E) escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;
   (F) providing materially false information to a judge or magistrate judge;
   (G) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;
   (H) providing materially false information to a probation officer in respect to a presentence or other investigation for the court;
   (I) other conduct prohibited by obstruction of justice provisions under title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);
   (J) failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p);
   (K) threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.
This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct.

**Examples of Conduct Ordinarily Not Covered.**--Some types of conduct ordinarily do not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., § 3E1.1 (Acceptance of Responsibility)). However, if the defendant is convicted of a separate count for such conduct, this adjustment will apply and

increase the offense level for the underlying offense (i.e., the offense with respect to which the obstructive conduct occurred). See Application Note 8, below.
   The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:
   **(A)** providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;
   **(B)** making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;
   **(C)** providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;
   **(D)** avoiding or fleeing from arrest (see, however, § 3C1.2 (Reckless Endangerment During Flight));
   **(E)** lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).
   **6. "Material" Evidence Defined.--**"Material" evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.

  The general tenor of USSG §3C1.1 is hiding or lying in the course of an investigation or judicial proceeding. In reviewing the commentary to this section and while the defendant understands the list is not comprehensive the types of actions that are listed are significantly more egregious then what the defendant has done. Exercising his right to go to trial and to testify at trial does not constitute a direct basis for imposing this enhancement. The fact that the government disagrees with the defendants recollection does not mean that the defendants recollection is somehow not true.

  At trial, the defendant testified truthfully as to what his involvement was with the DC Brigade Telegram chat.

  He testified that he was not one of the original parties to the chat and was added several hours after the original posts were made to the DC Brigade Telegram chat. There was no evidence presented that contradicted the defendant's testimony.

8
DEFENDANT RONALD MELE SENTENCING MEMORANDUM

The government's contention that because certain posts appeared on the defendant's phone at some point prior to the defendant being added to the chat does not materially contradict what the defendant testified to concerning the DC Brigade Telegram chat.

Further, at trial the defendant never denied that he was added to the Telegram chat. His testimony was that he was a minimal participant on that chat and because of his work schedule did not have time to read most of the posts and that he never went back to read anything that was posted prior to him being added to the chat. Moreover, the defendant quickly lost interest in the telegram chat as was evidenced by his lack of involvement in posting on the chat.

However, he also never attempted to downplay or deflect responsibility from himself for being on the chat such that a 2-level enhancement would be appropriate.

Adding 2 levels pursuant to USSG §3C1.1 should be rejected by the court.

## IV.

## MISCELLANEOUS ISSUES

Paragraph 118- The defendant lives in a home that is 1915 square feet. It is 3 bedrooms and 2 bathrooms. After the defendant's indictment and arrest, he was unable to find high paying employment, and he was not considered credit worthy and as a result he is not on title for this home.

Paragraph 141- The home's actual value is approximately $379,499. This value is achieved by comparing new homes with the same floorplan for sale in the general neighborhood. As noted above, the defendant is not considered credit worthy by lenders due to the arrest and indictment. Therefore, he is not in the title and has no interest in this property.

| | | |
|---|---|---|
| Paragraph 125- | | While the pre-sentencing report states that "[h]e did not report any lingering side effects, the defendant does continue to experience atrophy and reduced dexterity in the use of his left hand. |
| Paragraph 148- | | At the beginning of the case, defendant attempted to retain counsel for the defense.  Some funds were raised at that time ($5,200.00). All the funds raised were used to retain counsel. None of the funds received went for living or entertainment. |
| Paragraph 152- | | For the tax year 2022, the defendant's gross earnings were $44,535. For the tax year 2023, the defendant will show gross earnings of about the same amount. |

### V.

### IMPRISONMENT WILL HAVE A DEVESTATING IMPACT ON DEFENDANTS FAMILY.

The defendant, Ronald Mele, has a wife and two teenage students residing in his household. As the court knows from the pre-sentence report (paragraph 141), the household has positive cash flow monthly of just $157. Without the defendant's income the family will be in dire financial straits. It will likely require government assistance and could cause the family to collapse.

Defendant request consideration of the impact on the family in the event of imprisonment.

CHARACTER LETTERS

The defendant submits the following character information as attachment 1 for the Courts consideration.

## IV.

## CONCLUSION

Defendant Ronald Mele submits this memorandum for the court's consideration. Defendant requests the court's leniency in this matter and that the court consider a grant of probation with no prison.

The defendant request that the court consider the fact that the defendant did not engag in direct violence against law enforcement, that he did not bring firearms or deadly weapon on to the Capitol grounds, that he did not go into the Capitol building itself, that while he made his way to the West Terrace, he was present on the West Terrace for approximately 10 minutes before he left the area and went back to the lawn and engaged in no further activity with the mob. Defendant also requests that the Court consider that he left the grounds of the Capitol and returned to his hotel before the citywide curfew went into effect.[2]

The defendant also would request that should the Court impose custody time, that the Court would allow the defendant to turn himself into the facility on a date set by the Court and that the Court recommend that the time be served in a facility in or near San Antonio, Texas, so that the defendant can remain in contact with his family. The closest facility Bastrop Federal Prison in Bastrop, TX and should the Court determine that imprisonment is to be the outcome, the defendant would request that the Court recommend to the Bureau of Prisons incarceration in this or another locally situated facility.

---

[2] Defendant notes that the Government Sentencing Memorandum was filed today, April 12, 2024 and defendant respectfully requests permission to respond in writing if necessary to allegations and contention raised in their memorandum.

Respectfully Submitted,

Dated: April 12, 2024

/s/ Steven C. Bailey
Bailey and Romero
680 Placerville Drive, Suite A1
Placerville, CA 95667
Phone: (530) 647-3554
steven@baileyandromerolaw.net

I hereby certify that on the 12th day of April, 2024, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

/s/ Steven C. Bailey
Bailey and Romero
680 Placerville Drive, Suite A1
Placerville, CA 95667
Phone: (530) 647-3554
steven@baileyandromerolaw.net

ATTACHMENT 1

Steven Marshall
5467 Tallgrass Blvd.
Bulverde, TX 78133
916-479-0566/Smarshall242424@gmail.com

March 10, 2024

Honorable Judge Royce C. Lamberth
United States District Court for the District of Columbia

Re: Sentencing of Ronald Mele

Dear Judge Lamberth,

I am honored to be writing this letter to tell you about my friend, Ronald (Ron) Mele. As I write this, my prayer is that the words of this letter will give you a glimpse of the person I have come to know in contrast to the picture that was presented in the criminal case against him.

Before I share about Mr. Mele, I want to provide some background about me to give perspective on just how seriously I take writing a letter of this nature. I am a 56-year-old, 3rd generation, retired peace officer, who previously worked for the California Department of Corrections and Rehabilitation (CDCR) for nearly 28 years. I started my career in a California prison in 1990 where I worked for 10 years as a Correctional Officer and Correctional Sergeant. In 2000, I promoted out of our Division of Adult Institutions and took a position as a case-carrying parole agent in our Division of Adult Parole Operations (DAPO). I directly supervised parolees at all levels in Stockton, CA for 6 years before ascending through the ranks of DAPO as a Parole Agent II (Specialist), Parole Agent III (Supervisor), Parole Administrator over the state's Electronic Monitoring Program and ended my career in November of 2017 as Associate Director of Parole.

Upon my retirement, my wife of 35 years and I moved from California to Texas to be near our adult children and grandchildren. I have 33-year-old twin sons (one is a police officer, and the other is a nurse), a 28-year-old daughter (married to a firefighter and a mother of twin girls) and a 24-year-old daughter (currently a Worship Leader at our church). We have been blessed with 8 (soon to be 9) grandchildren and nothing means more to me than their ability live a faith-filled life in a safe community with the many freedoms offered by this great nation.

As you can imagine and have undoubtedly experienced yourself, working with and around people in the criminal justice system has caused me to be very guarded when it comes to deciding who I will and won't associate with. I believe my work experience and some God-given gifts have provided me with the ability to effectively judge the character of people I encounter. Taking all of this into account, and fully knowing the circumstances of the charges Ron has been convicted of, I send this letter with confidence that his character is not as it's been portrayed in his trial.

I met Ron and his wife, Elly, in October of 2022. They had recently relocated to Bulverde, Texas and had started attending the church I attend, CrossBridge Community Church in San Antonio. They joined our "life group" (a small group of people who meet in homes each week to fellowship, study the bible and grow closer to God). Ron and Elly immediately connected with the people of our life group and shared details about the trial he was facing as a "January 6th defendant."

Because of my background, after hearing about his arrest and the pending charges, I proceeded with caution as I assessed the depth to which I would connect with Ron. I listened and watched closely to determine if Ron was really the kind and caring person being portrayed in our life group or if there was some type of ulterior motive. It didn't take long for me to see that the person we had come to know in life group was authentic in his faith and consistent in his character and in no way, shape or form resembled the man I read about in the various new articles.

As Ron continued to deepen his relationships with our church and life group community, I developed a deep trust of him and invited him to join me and two other men in a discipleship group outside of our life group. The men and I met weekly for approximately 6 months to celebrate God, hold each other accountable to growing closer to God, and to studying the bible and walking in integrity each day. I watched as Ron's heart continued to soften from what already appeared to be a soft-hearted man.

Since concluding our discipleship group, I have continued to meet with Ron and Elly each week in our life group and see him nearly every Sunday at church. We talk regularly to encourage each other in our spiritual walk and to support each other in and through the difficulties of life. As Ron's case has progressed, he has continued to walk in humility and has maintained the caring heart I previously described. He is an upstanding community member in the neighborhood we live in, and he is a supportive husband to Elly and father to Elly's children.

As I conclude this letter, I go back to something I said at the beginning; I am very careful about the people I associate with. If I had even once seen a significant character flaw in Ron, I would not have shared these words with you today. I fully understand the very difficult decision the court must make in deciding on the appropriate sentence for this case and others like it. I am a person who believes in justice, but I'm also one who believes in grace and mercy at times that don't make sense to most people. As a career law enforcement professional and as a friend to the defendant, I ask for the court to offer that grace, mercy and leniency to Ron at his time of sentencing. No matter what, I will continue to respect the court's decision and thank you for taking the time to read and consider the words of this letter.

Sincerely,

Steven Marshall